et al. Mr. Dupree for the appellant, Mr. Rabb for the appellee. Mr. Dupree? Good morning. May it please the Court, Tom Dupree on behalf of the Association of American Railroads. This is a constitutional challenge to a statute that gives Amtrak the for-profit government railroad regulatory authority over private sector railroads. The statute further provides that if Amtrak does not exercise its regulatory authority, then an unspecified arbitrator will step in and draft and issue the federal regulation. This scheme is unconstitutional. The Supreme Court's ruling that Amtrak must be deemed a government entity for purposes of this case does not change the outcome this Court previously reached because this statute is constitutionally flawed in several respects. Now, let me stop you there before you get to the flaws of the statute. Because of the somewhat peculiar posture of this case, as you have pointed out, the first thing that we have to figure out is what is still before this Court. So it would be very helpful if you could start there telling us what you think is preserved and why. Absolutely, Judge Brown. We think there are three general arguments that are preserved for this Court's review. Those arguments include our due process challenge. They include our challenge to Amtrak's constitutional eligibility to be the delegated recipient of rulemaking power. And they concern our challenge to the arbitrator provision. As far as establishing that these are preserved, I suppose the arbitrator provision is probably the clearest because it's long been consented in the government before this Court agrees that's fair game for challenge. So I think that's settled. As far as our first two challenges, which the government does contest, let me first take due process. We preserved our due process challenge to Section 207 in several different ways. The first way it was preserved is it's set forth in our complaint. Paragraph 54, which is reproduced on page 21 of the joint appendix, pleads our due process claim broadly. It does not say that the due process violation depends on a determination that Amtrak is a private actor. Paragraph 53, to be sure, does. But obviously it's quite common in pleadings to have different paragraphs, different claims. Some are narrowly phrased and some, like paragraph 54, broadly phrased. Even if that weren't sufficient, it's undisputed that we raised our due process argument in the district court in our opposition to the government's motion for summary judgment. Keep in mind that this case reaches this Court on a grant of summary judgment in the government's favor. That's the decision that's currently under review. And I think it's well settled that when a party raises an argument in opposition to a summary judgment motion and then loses on summary judgment, that those arguments are preserved for review. They have to. It sounds logical. Do you have any cases other than Center for Auto Safety? Center for Auto Safety seems to be distinguishable. Well, again, I'm not going to get… Distinguishable in the sense that the issue presented there in the response to the motion for summary judgment related to how the Court should sort of procedurally maneuver in resolving the substantive claims. And that seems to be somewhat different from a new constitutional claim. Well, there's also… Again, I would take issue with the notion that it's a new constitutional claim. In other words, we did present it in our complaint, but even if for some reason… No, no, I'm talking about the way in which Amtrak is constituted. Ah, I take your point, Judge Williams. Thank you for clarifying. The appointments clause challenge, which is part of our basis for Amtrak's, the way it was constituted, that was an argument that we raised, again, in our opposition. Right. And in addition to the Center for Auto Safety case, I believe it's also the 1L case, which the government relies on, where the Court said an issue was waived because it was not raised in the response brief. And, of course, I think it was perfectly fair game for us to raise… That was a case where the District Court specified very clearly, if you want to do something, do it now. Council didn't do it. Let it go. Then raises it much later. So that's surprising that that move didn't work. Right. And the way that this arose here, Judge Williams, is that in the government summary judgment briefing, where, as this Court is well aware, the government has always taken a very amorphous, protean position as to whether Amtrak is the government, and when they suggested that, well, maybe Amtrak could be deemed the government, we then fired back and said, no, that's not permissible because it would raise an appointments clause problem. Again, raised in our opposition in summary judgment. We lost on summary judgment. That's fair game. I think even if the Court were to overlook our complaint, the briefing in the District Court, it's certainly fair to say that we raised these claims in our first appeal before this Court. We raised them in the Supreme Court. And to be sure, the Supreme Court's decision, I think, could fairly be characterized as an intervening change in law. The Supreme Court has now come out and said, Amtrak must be deemed the government for constitutional purposes in this case. And as Justice Alito said, deeming Amtrak the government raises a host of constitutional questions. And there's very good authority for when there's an intervening change in the law, such as a Supreme Court decision that says, litigate this case going forward on this premise, that even if we hadn't raised the appointments clause challenge before, which I think we have, but even if we hadn't, I think the Supreme Court's intervening decision would give this Court more than ample basis to address it on the merits. In the extent that you were raising it on appeal and hadn't preserved it below, and I realize that's not your position, but the extent that that is the government's position, have they waived the waiver by not telling us that the last time they were up here? Judge Sentelle, I think that's right. And as Your Honor correctly notes, there's a fairly robust case law saying waiver arguments themselves can be waived. And the government, you're right. The government has not taken the position that we've waived these arguments. I suppose the due process challenge is an exception. They have taken that position, but I think we're correct on the merits there. But as to the other arguments, you're right, Judge Sentelle, they haven't. I think all three arguments are properly preserved for this Court's review. Of course, Justice Thomas delivered the most robust opinion of any of the Supreme Court opinions in this case, and he prefaced his opinion by saying, I write for the purposes of identifying the issues that are preserved for the D.C. Circuit's consideration on remand. I don't think Justice Thomas was engaging in an empty exercise. He obviously thoroughly reviewed the record, and he set forth what he thought are the issues that remain in this case, as did Justice Alito, who exhaustively examined, or reasonably exhaustively examined, the appointments clause issue as well as all the other issues that we've been discussing. The appointments, I'm sorry. I'm getting ahead of myself. Go ahead. No. If there are no further questions on the preservation issues, I'd be delighted to jump into the merits, and perhaps I could begin with due process. We believe that it is self-evident that due process does not allow Congress to say one market competitor may regulate another. That black letter rule was first articulated, or may be most clearly articulated, in the Carter-Hole case, where the court said it violates due process to allow a corporation to exercise regulatory authority over its market competitors. That's exactly what's happening here. But does it permit Congress to say an entity that is sort of the government can have that kind of authority? Well, Judge Brown, that's a great question, and I think ultimately it turns on, is Amtrak, as constituted by Congress, capable of acting as a neutral and disinterested regulator? That is to say, a regulator that can act for the common good, in the public interest, and not through a narrowly focused Amtrak-only lens. We think the answer to that question is no, for many reasons. For one thing, Amtrak has a for-profit mandate. Congress said in the statute, you shall run Amtrak as a for-profit corporation, not as a government regulator. In fact, if the court were to log on to Amtrak's website this morning, they'd continue to say, we are not a public entity. We are a for-profit corporation. That's how they view themselves and their mission, and that's undergirded by the statutory mandate as to how they conduct operations. Now, to be sure, Amtrak does pursue a variety of goals that are set forth in the statute, so-called public-focused goals, such as they need to operate a train line between Florida and Louisiana, they have to offer reduced rates to disabled passengers, they have to buy American goods, those sorts of things. But the critical point, for due process purposes, is that nothing in Amtrak's statute or the way it's constituted or the goals it's supposed to pursue ensures that they will take into account the interests of the freight railroads, the regulated parties. It doesn't say they'll take into account the interests of the passenger railroads against whom Amtrak directly competes to provide passenger service. There's a very informative amicus brief submitted by a passenger rail organization, in this case, that talks about how they try to compete with Amtrak for the right for a franchise to operate passenger service in various cities and towns, and the criteria by which these franchises are awarded are the metrics and standards that Amtrak drafted, and then it gets awarded the franchise. Surprise, surprise. One of the arguments, at least, that the government has is that the RFA will insist on the public interest because its sign-off is necessary for anything to take effect, outside the arbitrator. The STB, Your Honor? I'm sorry, it's the regulatory agency. Right, the STB? Well, you have two. The FRA. The FRA. The FRA, I'm sorry. That's right. The FRA. That's right, and I think this Court addressed that question in its prior decision. In other words, it's a joint 50-50 split of regulatory authority. But the key here, of course, is that if Amtrak wants to do one thing and the FRA wants to do another thing, the FRA is powerless to overrule Amtrak's desire, and vice versa. That's the situation where it's the arbitrator's decision. And vice versa. The arbitrator can be. Exactly right, Justin. Whoever the arbitrator is. Whoever he or she may be. Or it. But the point, Judge Williams, is that it's a power-sharing agreement. The government, the FRA, does not have the final say. It is powerless to say we are going to trump Amtrak's decision here. In that situation, again, the arbitrator comes in. That's why it's a problem. The FRA doesn't have the final word. Do you think if the problem here is who is deciding what these metrics would be, would there be a constitutional question here at all if Congress had simply enacted the metrics? Not of the type we're discussing, Judge Brown. I'm sure I could come up with other reasons why it would be unconstitutional. But for present purposes, that's right. I think for present purposes, the problem is that Congress has given regulatory power to a self-interested for-profit market participant that's been given the power to regulate the very industry where it's trying to get business and to gain market share to regulate its competitors. It's a patent due process violation. Had Congress done what Your Honor posited and simply enacted it, I think most of the problems we're discussing today would evaporate. Similarly, if Congress had vested the FRA with authority to issue the regulations, I think a lot of these problems we're discussing would evaporate. And I think that's a very telling point in that what we are asking this court to rule would not in any sense hamstring Congress from pursuing its objectives in the same way that Congress for centuries has pursued its objectives by giving a regulatory agency that is not a commercial business regulatory authority over an industry. That's the way that Congress has legislated for well over a century. The government has never identified a single other government corporation that regulates in the way that this statute allows Amtrak to regulate. And, of course, as the Supreme Court has said, the fact that there is no historic precedent for this type of entity is a telling indicator of unconstitutionality. I think another way that the due process violation is stark is Section 207C. That's the contract provision. That's the provision that says the freight railroads and Amtrak shall rewrite their contracts to the extent practicable, but they shall rewrite their contracts to implement and to integrate the metrics and standards. So you have a world in which Amtrak negotiates these contracts with my clients wearing its hat as a commercial private business. Then it puts on its regulator hat and it says, now we're going to amend those contracts. It's a clear due process violation. Can the railroads refuse to do that? I mean, it says as practical, as practicable, I guess is the word. That's right, Judge Brown. And our position would be that unless what's practicable is a null set, it has to have some effect. I think what would happen if we were in a situation where Amtrak said, this is practicable, the railroad said it's not practicable, is that ultimately the dispute would be resolved perhaps even up to the Surface Transportation Board, which would decide what's reasonable. And in that posture, I am very confident that Amtrak would come forward and say it's perfectly practicable for them to do this. And so we're under a legal duty, if the STD agrees, to comply. So the practicable limitation is some limitation, but, again, unless it's a null set, it means we don't have to do anything, which I can't imagine the government would agree is the case. It has to mean something, and it has to have some regulatory effect. Let me say a few words about the arbitration provision. This notorious provision says that if the government or the FRA and Amtrak don't reach agreement, a potentially private arbitrator will step in. It's a shocking provision without precedent as far as we can tell in American law. The notion that a private individual could issue federal regulations that are published in the Federal Register. I don't know why you're saying a few words about that. I would have thought that would have been your lead-off hitter. Judge, we have so many good arguments today, it's difficult to know the order in which to structure them. But I think it's a very powerful argument. The government agrees that it's fully preserved for this court's review. I don't think there could be a serious argument that a private individual could issue federal regulations. Does it make any difference whether the arbitrator is a private individual or is coincidentally a government employee? For purposes of our challenge, it would not, Judge Sentelle, because of course the acid test is what is in the statute. And as Justice Alito said, if the statute allows for the potential for a private individual to serve, it's invalid. Yeah, I think you know you've got one vote on that issue. I feel reasonably confident, yes. So the whole point about the arbitration— The arbitration of justice, keep his hand up clearly, I think. Yeah, I agree with Your Honor. And I think the government's suggestion that this court should essentially rewrite the statute is far-fetched. Not only would this court need to insert language requiring a government arbitrator, which doesn't appear in the statute, but this court would also need to draft appointment provisions because, of course, any individual— since the statute doesn't require it nor set any parameters on what sort of government employee, nor does any statute empower some government employee to serve in that capacity, I don't know how it makes any difference if it's coincidentally a government employee. That's right, Judge Sentelle. I don't think it does. I think the statute is void ab initio because this court, in addition to inserting the government language, would have to draft appointment provisions. It would also, frankly, have to draft removal provisions to ensure that the arbitrator could constitutionally exercise his or her duties. So when the government, as I anticipate they will, stands up in a minute and urges this court to redraft the statute, it's a big lift. This court will have to do a lot of drafting. It's not one or two words. If I could reserve the remainder of my time for rebuttal, I'd appreciate it. Certainly. Thank you. Thank you. May it please the Court. The plaintiff brought this suit initially based on the view that Section 207 was unconstitutional because it impermissibly delegated authority to a private entity. Now that the Supreme Court has made clear that Amtrak is a governmental entity for purposes of these claims, they rely on the same case, Carter-Cole, to argue that this constitutes a violation of the due process clause. The passage of Carter-Cole, on which they rely particularly, does not seem to be focused on the government delegee issue, or the government status of the delegee. Well, it is focused on Carter-Cole. The private status of the delegee. Of course, what Carter-Cole involved was an unbridled delegation of authority to an unaccountable private entity. And what the Supreme Court made clear was that that is not what Amtrak is. It is not a private entity. It is by no means unaccountable to the political branches. To the contrary, the political branches, as the Supreme Court recognized, control the composition of the board, hold all of Amtrak's preferred stock. It exercises all sorts of important controls, including on the board members, eight of the nine of whom are appointed by the President and confirmed by the Senate, include the Secretary of Transportation and his delegee to serve on the board is the Federal Railroad Administration. So Carter-Cole involved circumstances far removed from what we have here. And moreover, the Supreme Court subsequently, as explained in our brief, in Friedman v. Rogers rejected a due process challenge to a board, the composition of which was a majority of individuals antagonistic to the economic interests of the plaintiff there. And although it's clear from the Supreme Court's decision that there may have been a due process problem with that board exercising adjudicatory functions, which, of course, here there's an independent adjudicator, the STB, to resolve any disputes, the court was at pains to note that there was no due process problem with regard to the regulatory actions of the board. It seems to me the classification of this decision is not that easy. In other words, it would be what emerges from Amtrak and the agency would be a rule within the meaning of the APA. That does not necessarily make it a regulation for purposes of the due process clause, right? Exactly right. And we would emphasize, as we note in our brief, that all these metrics and standards do is trigger an investigation with regard to the preexisting statutory preference requirement of long-standing business dating back to 1973. Yeah, but also amendment of the contract and imposition of fines, right? Well, no. With regard to, well, no fines of any kind or other relief as the statute of experiment imposed unless there's been a violation of the preexisting statutory preference requirement. All that the metrics do... Don't the metrics affect the preexisting statutory preference? No, Your Honor. What they do is control the circumstances under which a proceeding can be instituted by Amtrak or a freight railroad. So the sole work they're doing, Congress could have said any time Amtrak or a private railroad, that you think that there is a violation of the statutory preference requirement, you can go to the STB and start a proceeding. There's nothing unusual or problematic about even a private individual, let alone a government entity like Amtrak, from instituting an adjudicatory proceeding before an independent body. What Congress did with regard to the metrics and standards is say, we're going to limit that circumstance in which you can require an investigation by the independent STB. That can only happen if you demonstrate that you haven't met these metrics and standards, which were co-authored by the FRA and which serve to inform the important public policy objective that Congress had to ensure reliable intercity passenger... But they're all on your view of the amendment of the contracts between Amtrak and the host railroads. Yeah, with regard to that, as Judge Brown recognized, the reference is to the extent practicable. And this Court, in other circumstances, like with regard to the Endangered Species Act, has indicated that that connotes not a mandatory obligation, but to the contrary suggests that it's not mandatory. And moreover, we think that in context, what Congress was likely getting at was, many of these metrics didn't even address on-time performance at all. But to the extent you could even, it wouldn't make sense even to put into the contract. To the extent any of them would make sense to be put into the contract, these are bilateral negotiated agreements and that you could expect... Bilateral negotiated agreement, are you saying that each host railroad has a complete right, the way they would in an ordinary market, of saying no? Well, they do. We think that they would have a right to demand compensation to the extent that they perceive the inclusion of a metric or standard in any of these complicated bilateral negotiated agreements should be put in. If Amtrak is saying we want this in, it's certainly open to the freight railroad to say, well, if you want it in, you're going to have to pay for it. And that could in turn determine the practicability of whether Amtrak wanted to pay for it. And any disputes would go ultimately to the independent STB to be resolved, which has the authority to resolve disputes over contract negotiations and impose reasonable terms on the parties. That's the independent STB. At each stage, there is ample process being provided here. And again, to get back to Friedman against Rogers, to explain there, the board in that case, contrary to what was indicated in the plaintiff's reply brief, if you look at Rogers' brief before the Supreme Court there, what's clear is that that board was issuing what it called interpretations of the relevant statute that if violated, that had the force of law in the board's view, and that if violated could form the basis for an adjudicatory proceeding brought before that very board. There's nothing close to what the metrics and standards don't even come close to that type of regulatory conduct. And even there, the Supreme Court recognized that there's no due process problem. And Olin refused to apply the strict standards that apply with regard to adjudications, which again, it mentioned the adjudicatory powers of the board, and it said that could very well present a problem, citing to earlier decisions like Gibson v. Berryhill, but it said with regard to the regulatory aspects, it rejected the due process challenge. Yeah, I don't think that Carter-Cole is properly understood. Again, what Carter-Cole involved was, as I was indicating to Judge Williams, is an unbridled grant of authority unchecked to a purely private set of coal companies. Amtrak, as the Supreme Court made clear, includes ample control on the part of the political branches. You talk about ample control, but are any of those controls directed to the protection of the host railroads? Yeah, we think the fact that the Federal Railroad Administration is the delegee of the Secretary of Transportation and sits in on board meetings, the Secretary of Transportation, who is no stranger to the need for proper fare standards to govern the freight railroad industry, plays an important role on the board, that Congress as well is sensitive to the interests of the freight railroads, and as the Supreme Court recognized, exerts ample, substantial control over all sorts of Amtrak operations and regularly supervises it, and there are all sorts of other structural accountability mechanisms. There's an Inspector General of Amtrak that's subject to the FOIA, regular hearings before Congress are held. There is no indication that the freight railroads had their due process rights violated by having a governmental entity, the FRA, co-author the metrics and standards with another governmental entity. Amtrak. I'm not sure why that co-authoring is determinative. It's co-authoring in the very strict sense that they're half and half, so if you've got half the authority, you've got enough authority to litigate over. It would seem to me that if it's unconstitutional to give all the authority, it would be unconstitutional to give half. I'm asking you to beg the question and assume that it is unconstitutional, but the fact that it's half rather than a hundred doesn't really matter, does it? Well, in this case, where the other half is Amtrak that has on its board the Secretary of Transportation and where there are all these other accountability mechanisms in place, we do think it's different in kind from what might otherwise be problematic. But we don't think in any way there's a— I'm not sure why that would be. If it were unconstitutional for them to have this power, why isn't it unconstitutional for them to have payful power? Well, we don't think that it's unconstitutional for them to have the power. I know that. That's why I put the word if at the beginning. Yeah. We think that the many accountability mechanisms identified by the Supreme Court and noted in our brief sort of make clear that there's ample governmental, neutral, sufficiently unbiased governmental control, but it's important to recognize that even if the metrics and standards were an actual regulation, this Court has indicated that due process concerns operate in a much more relaxed fashion with regard to rulemaking proceedings than they do with regard to adjudications. Yeah, but there are rulemakings and rulemakings. There's a pair of cases, Londoner v. Denver and Bimetallic. Those seem to apply different due process standards depending upon whether you have a focused and a decision which is focused narrowly on very specific parties as opposed to a general rule. In other words, the way in which the APA includes both general and particular does not reach out to the due process clause. I don't think that the nature of this rulemaking sets it apart from cases like the FTC case that we cited in the brief and all of the progeny that followed, including the case that was cited earlier this year. Let me give you a hypo. Let's take Judge Brown's opening hypothetical in the beginning of the 2013 opinion and adjust it slightly. You have an automaker which is 100% owned by the government, and because the government, let's assume, has imposed a ceiling price on steel, there's a need to allocate steel, and government motors plus the Department of Transportation allocate, are given authority to allocate steel as between government motors and all its competitors. Is that free of due process problems? We don't think that's a due process problem, but we do emphasize that it is. Why is it not? I mean, due process is slippery. It certainly sounds very troubling. Well, again, we would point the court to cases like Freedman v. Rogers where there was clearly numbers that were intact. Yeah, that involved simply the composition of the board, and it hadn't reached the question of what the board's actually doing anything to any particular person. Well, but as I was indicating, if you read the opening brief filed by Rogers before the Supreme Court, it's clear that they were issuing interpretations of the statute that they said, that the board said were binding, had the force of law, and could form the basis if violated for an adjudicatory proceeding before that very board. And so I don't think, and the Supreme Court, again, did not hesitate in finding no due process problem with regard to the regulatory aspects of things. I want to be clear in following up on Judge Williams' question that you're saying that even a situation like that would not raise any due process concerns as far as the government is concerned. We don't think that would be a due process problem, but we do hesitate, we do quickly note that the differences with regard to Amtrak here and all of the controls that Congress exercises, that the executive branch exercises, the control over the composition of the board, the fact that the government owns its stock, and the fact that the Secretary of Transportation, attuned as he is to the freight railroads as well, serves as a board member of Amtrak. But you could have that same circumstance in what Judge Williams just described. It's government motors, right? They own the stock. It's a governmental entity. But it's a governmental entity that is involved in a private sector enterprise. And so I'm just trying to understand, you know, what I don't see here then is any cutoff. I mean, it seems like once the government puts its imprimatur on something and says, well, it's really ours, but it's playing, you know, in the private sector against private companies, is the government's position that then whatever that entity chooses to do, there could never be a due process problem because it is quasi-governmental or sort of the government? Well, there may very well be important distinctions, depending on how much control that the government retains over the entity. And, moreover, here it's important to remember that any bias really adheres in the fact that Congress enacted in 1973 the preference requirement. And as I heard, I did not hear any definitive anyway constitutional objection. There certainly has never been any suggestion prior to that, Congress not being able to enact that preference requirement in order, as part of taking over the public responsibility of ensuring reliable intercity rail, that Congress properly exercises its authority to say, okay, then if we're going to have Amtrak perform this public objective and function, then it's got to have preferred access to the freight railroad's track. And that's what's going on here. There's a preexisting statute that makes these judgments that create any perceived bias here. And there's no due process problems there. We really are in the bimetallic world. Well, if I'm just to go back to an earlier point you made, your position I think is that for the host railroad's obligations to be increased under this scheme, there must, in addition, be a renegotiation of the contract. And with respect to that renegotiation, the host railroads are in a position an ordinary market entity would be? Is that correct? Yeah. Well, we see them at arm's length with Amtrak. We don't see this contract provision as imposing an immediate regulatory requirement. Well, let's strike immediate. An irregulatory requirement. We think that by virtue of it saying to the extent practicable, nothing is imposed. Well, who decides whether it's practicable? Well, at the end of the day, if there is any dispute, that goes to the STB, the disinterested STB. So, again, to suggest that that's a due process problem, that's who would determine. If I'm understanding your position, a decision arrived at by Amtrak and the FRA puts the host railroads in a position where they either cave in accepting new obligations or they have the hope of a decision before the STB which will refrain from imposing everything that Amtrak and the FRA demand. Well, what they have is a right to negotiate at arm's length with our Amtrak over what, again, Amtrak would have. It's all very well to talk about negotiating at arm's length. The question is what happens if you end up disagreeing normally when you have a real arm's length negotiation and A says forget it, it's not going to be a deal, that is the end of the matter. No, there would be, the Amtrak would have the opportunity to go to the impartial disinterested STB to determine what the content of the contracts should be just as with any other aspect of these contracts. And the fact that the disinterested STB would be the ultimate arbiter makes clear that there's no due process problem. Well, it doesn't make it altogether clear because the, I mean, it assumes the STB has the power to mandate a shift in the contract against the host railroads. Well, again. But uncompensated shift. To show how far removed we have come in this case, you know, they've never introduced any of these contracts into the record, let alone explain how these. This came up on summary judgment very early in the game. It's not surprising that we don't have the same full record we would have if we had a full administrative procedure. Right. I don't know why you would expect them to have introduced any contract. Well, you're emphasizing that this is at the rulemaking phase and that it's a summary judgment concern, but regulatory phase as opposed to adjudicatory. Normally we don't see examples of what would happen if the rule were enacted. I mean, that argument gets you nowhere. They haven't introduced any contract. They haven't given any yet. We're still at this stage of it. Well, there are existing contracts. And what would happen and what the provision envisioned was that the parties, to the extent practicable, no mandatory obligation would consider whether they would come to an agreement as to whether to put these contracts in the record. Your own further argument assumes, as did William, suggests that that's not the end of it. To say we don't think it's practicable, we're walking away. You're assuming that it can go on and become a mandatory obligation. I mean, again, there's no indication that the STB in performing its role, I mean, there's no indication that anybody has insisted that anything be put into the contract at the present time. In terms of the original negotiation of contracts, when Amtrak was created, does the statute have an explicit provision on what happens in the event of disagreement over the insertion of the contract of the statutory preference? Well, the statutory preference has its own, in the preference requirement itself, it provides for, in the current version, it provides for a freight railroad, if it's concerned about the way it's being interpreted and applied, it can go to the STB to complain and seek some sort of adjustment about it. I'm sorry, the way the preference is being interpreted? Yeah, exactly. If they feel that the preference, as it currently stands, is imposing an undue interference with the freight railroad's operations, they have the opportunity to go to the STB to complain. And that is the standard before the STB? Is it an undue, what was your term? No, it's not that standard. If you look at the statute, it talks about what would be the standard, subsection C, of the relevant provision of the statute. But what the statute also makes clear, though, Your Honor, is that with regard to other disputes with regard to their contracts between the freight railroads and Amtrak, that's a standing role of STB to resolve them and to determine what reasonable conditions should be put into the contracts. My colleague has been indulging me for prolonging this past the red light. Can you tell us the government's nutshell position on why this arbitrator is a constitutional actor? Yeah, we think so. It was explained in our brief. The arbitrator, first of all— If we have oral arguments to have further explanation, go ahead, please. Sure, Your Honor. The arbitrator, we think, need not be read to be a private person that has indicated— First, you do agree that the arbitrator performs the final role in the regulatory decision if there has been a deadlock between the two co-authors, right? Although it's not entirely clear what the hypothetical arbitrator would have done if he or she would have been appointed, but it talks about binding arbitration. What we think, though— So that makes it sound as if the rulemaking authority is being delegated to this undefined arbitrator, does it not? And we don't think to the extent it was a government person that there would be any Carter-Cole concerns about that. I don't understand really why it would make any difference if it were a coincidentally government person, where the statute doesn't define what sort of government person and there's no statute giving a person the authority to act as that arbitrator. Why isn't the coincidental fact that he's a janitor at the courthouse immaterial to whether he can constitute and receive a delegation of the authority to decide on the truth? Well, the appointment of power and the removal of power rests with the STB, and the STB could—has not— They can unilaterally pick the arbitrator. Correct. And the arbitrator could be anybody they pick as far as the statute—but even if they do, I'm not sure why that matters if there's no statute that defines what the qualifications for this arbitrator are in terms of government position and some other grant that gives that person the authority to make that rulemaking. Rulemaking is something we have lots of due process cases on. I don't know any of them that says you can just pick out a given employee and make him or her the final decision maker on the content of a rule or regulation. Yeah, we—well, of course, we would disagree respectfully with the characterization of these metrics and standards as regulations in the sense that would even amount to a significant exercise of government authority within the meaning of Buckley, because for the reasons we've explained, they're really—their role is— Assume we're past that. If you're past that, we still think that the SCB could appoint an appropriate person with familiarity with the transportation business. Do you know of any other precedent for giving an undefined arbitrator the authority to make the final decision on a rule or regulation? I know you're not going to concede it's a rule or regulation, but do you know of any parallel case, even if you don't call it a rule or regulation? I'm not, but again, I don't think that that means that what the—first of all, that the hypothetical arbitrator that was never appointed would have been inappropriate. Again— It's not just a hypothetical arbitrator. It's a statutorily authorized arbitrator. That's correct. It's statutorily authorized. It's not just hypothetical. Well, it's statutorily authorized, but no arbitrator—it was a one-shot deal with limited duties to resolve any disputes that might have arisen. No disputes arose within the specified statutory 180-day period, and the STB would have ample authority, as explained in our brief, to appoint an appropriate government—certainly an appropriate governmental person to serve— Well, what makes that person appropriate? You're coming to what's voting. There's nothing in the statute that defines A, government employer, or B, appropriate. I mean, we think any of a number of possibilities, including individuals within the STB that might be appropriately appointed by the STB to serve that role, we think, as explained, that, again, it wouldn't even be the exercise of significant governmental authority, but even if it were, it would be at most an inferior officer by virtue of the removal powers that are inherent in the authority to appoint. I'm not talking about an appointment clause program. I'm talking about a delegation clause. If this is rulemaking or regulation, then there's plenty of cases that say Congress can delegate this, but I don't know of any that says they can delegate it to an undefined recipient of the power. I'm not sure, again, that this—I mean, I don't want to anger the judge, but, I mean, I don't— You'd be careful. He might bite you. But I don't want to suggest that these are regulatory, but even if they were, we're not aware of any case that limits— I thought you were insisting they were regulatory, not adjudicative. Well, at most they're regulatory. They're certainly not adjudicative, but we don't think— I'm sorry. So what's the third category? What are they instead? They are triggers for a possible investigation by the STB, and that's not something that constitutes impermissible regulation. How can they do that without being regulatory? Because all they're doing—it's a commonplace to have even private individuals institute adjudications before entities like the STB. And as indicated before, all these do is relax the circumstances under which a freight railroad might potentially be the subject of one of these investigations. The metrics and standards limit the Amtrak's authority to begin a proceeding before the STB. Thank you, Your Honor. Are there no further questions? Other questions? Yeah. Thank you. Thank you. You have three minutes remaining for rebuttal. Thank you, Judge Brown. My good friend, Mr. Rabb, is asking this Court to endorse a massive expansion of government power at the expense of free enterprise. Under Mr. Rabb's theory, the government could launch the Government Cola Corporation, put the head of the FDA as one of a dozen board members, and then the Government Cola Corporation can go out and put Coke and Pepsi out of business by regulating in a way that favors the Government Cola Corporation over its private sector competitors. Mr. Rabb's point, and the only point I heard as to why he thought, in response to Judge Williams' question, that Amtrak was capable of regulating in the public interest rather than through a narrow Amtrak-focused lens, is the presence of the Secretary of Transportation on the board. But let's look at this. There are nine board members. The Secretary is one. So even if one were to accept the notion that the Secretary is going to be a valiant defender of the interests of freight railroads, he gets outvoted eight to one. Next, Mr. Rabb argued that the Friedman case supports him. But, Judge Williams, I think you correctly know, all the Friedman court said was that it didn't have sufficient evidence before it to determine that the board members in that case did have a pecuniary self-interest in the subject of their regulations. I think a much more on-point case is the Gibson v. Berryhill case, which also involved a challenge to an optometry board. And in that case – But that is very clearly adjudicative, right? I take the point. Yes, it is, Judge Williams. But I don't think that this due process protection evaporates depending on whether you're in an adjudicative posture or what's considered more of a pure regulatory posture. Certainly Carter Cole supports us. And the whole point of Gibson v. Berryhill is that persons exercising government power shouldn't have a personal financial self-interest in what they're doing. One point that we harped on in our brief that they did not respond to in their brief and Mr. Rabb did not address at oral argument is the fact that not only does Amtrak have an institutional commercial interest, but Amtrak officers have a personal financial self-interest in the subject of their regulations, in the statute it says they get paid more in salary if Amtrak is profitable. Does that provision apply to the board members or only to management? I think to officers, Judge Williams. Meaning? Well, it certainly would apply to the senior core of officers. I don't know whether it would – Meaning management. Yes. Well, I don't know if it would apply to board members or not. But my point is that Amtrak's senior officials and the people who are drafting these metrics and standards, and I'm confident the Secretary of Transportation didn't put pen to paper in this case, the people who are actually implementing these regulations have a strong personal financial interest. Unless they're the board, that doesn't matter though. And Judge Williams, you guessed that officers would not be normally the same thing as board. Well. If it's made like a private corporation. Right. I take the point, Judge Sentelle. I mean, if the board members themselves were free of financial self-interest, I think that would offer some degree of protection. But, again, we're operating in a universe where the senior officials of Amtrak – and it's not just the statute. They also have adopted a compensation plan that says when Amtrak meets certain financial targets, they get paid more in bonuses and that. So my only point is that – The point of that is the managers, not the board. That's a fair point, Judge Williams. Now, the president of Amtrak does serve on the board, though, is that correct? That's correct. That's correct. It's not a mob board chairman. It's a president who is a board member. That's correct. That's correct. That's correct. Could you address Mr. Robb's argument that essentially we have nothing more than the original or a trivial spin on the original requirement of preference for Amtrak, which I must say is that the process of that negotiation is not developed anywhere that I've seen in the briefs. And he says this is just essentially more of the same. Right. And he's mistaken on that. I mean, look, Justice Alito had it exactly right where he said this scheme is obviously regulatory, obviously has a regulatory impact. I'm not talking about the classification. I'm talking about what happens if a host railroad says absolutely not, I will not play. Right. In that circumstance, what happens is we go before the STB ultimately, and the STB determines what's quote, unquote, reasonable. And I would expect. Is that the same as what happened originally when Amtrak was created? Well, originally when Amtrak was created, you had the freight railroads and Amtrak negotiating individualized operating agreements just as private businesses would. But over time, and this may have been several years after Amtrak was created, there was originally the ICC, which then was replaced by the STB. But that serves as the arbiter for whether or not terms and conditions are reasonable. So if Amtrak and the freight railroads have a dispute as to what goes into the contract, ultimately the STB is called in to prescribe reasonable terms and conditions. And our point is that that determination is now carried out against the statutory backdrop that says if a term demanded by Amtrak is practicable, the contracts have to be amended. I don't mean to be a reductionist here, but is the essence of the innovation here the change from STB ruling on reasonableness to STB ruling on practicability? Well, the STB's ultimate legal determination is still reasonableness. But it's my view, and I suspect the government would probably agree, that in determining what is reasonable, the STB would likely be guided by a federal statute that says if the terms demanded by Amtrak are practicable, they have to go in the contract. That's the regulatory power. And Mr. Raab's point about, well, ultimately you're going to have the STB adjudicating all of this, that doesn't change the fact that these metrics and standards have an immediate and a strong regulatory impact on us. They're writing the law. The fact that an independent judge is someday going to determine whether or not we violated the law is immaterial to the constitutional problem, which is that Amtrak is essentially writing the law, even if adjudications are determined by the STB. I'm sorry. Isn't there an intermediate step in which something rather flowing from the metrics and standards goes into the contract between the host railroads and Amtrak? Well, it would be a negotiation. In other words, the way this works, and by the way, in the record we have affidavits. I believe it's JA-276 where we have affidavits from our clients saying that Amtrak has already approached them and say we expect you to start integrating these into the contract. So they've already made that demand. Okay. That's in the record. That's in the record. Now, again, to be sure, this is not yet elevated to the point where the STB would be called in to adjudicate it. But our view is that unless we're prepared to say or the government's prepared to say that nothing will ever be practicable, there have to be at least some terms that Amtrak is going to try to unilaterally force down on us. There have to be some terms that are going to be deemed practicable. And in that case, it's a clear due process violation in that Amtrak's writing 100 different terms. It says incorporate all of these and maybe we'll ultimately be ordered to incorporate 5 or 10 or who knows. My understanding is that at the outset there were deals between Amtrak and the host railroads and at least some degree of provision for compensation of the host railroads. Is that true? That's true. That's true. So, I mean, if that's the case, if the burden is increased on the host railroads pursuant to this process, would not the host railroads have an entitlement to compensation as they did back in the origins of Amtrak? It's possible we would, Judge Williams. In other words, to the extent that we are burdened by Amtrak's demands, ultimately we would take the position that we have a right to be compensated. But I don't think that alleviates the due process problem, which is that we're being forced to modify the terms of our contract. I don't think it – You're only being – I mean, it may address the takings. You're only being forced to modify them under the original rules plus the practicability provision. Is that right? That's right. And if it's the case that the original forcing allowed, invited – I'm not sure what the right verb is – compensation for a significant shift against the host railroads, why would it not do so here? Well, I mean, again, Judge Williams, we're not sure ultimately how it would play out. I mean, it could, but I guess my point is simply that your honors analysis is more in the realm of the takings, that they can take away our property rights as long as the government, in theory, which I think is a practical matter, would probably not happen because the railroads are not fully compensated for hosting Amtrak. But even if there was some sort of mechanism whereby we could get redress from any contract provisions that were forced on us, I still don't think that solves the fundamental due process and non-delegation problems in this case. It might address a takings argument. If we had said this amounts to an unconstitutional taking, I think that would be a fair point to say, you're going to get compensated at the end of the day. But our challenge is to the fact that Congress has given Amtrak the power to write the law, and I don't think it's a satisfactory response to say it's okay to have these unconstitutional delegations and due process violations because the STB will true it up at the end. I think that addresses a different constitutional concern. One other point is in addition to all... Suppose you have a government redevelopment agency which is empowered to take land subject to a duty of compensation. Is that parallel to what we have here? I mean, and the redevelopment agency, let's assume, is told to go out and develop things and make a profit and so forth. I think it would pose very similar problems. Again, I don't think that's... Would that not be answered by the duty to pay compensation? Well, I'm not sure it would, Your Honor. In other words, certainly if they did what Your Honor posits, I think you would have a valid takings claim if you weren't justly compensated. But I don't think it would address the other constitutional violation, which is giving a for-profit government corporation the power to write the law. It's a separate constitutional violation that doesn't have to do with whether or not we're ultimately compensated at the end of the day. The bottom line is Congress can't empower one for-profit corporation to regulate another, even if it's going to somehow make us whole at the end of the day. It's a separate constitutional violation. The other problem we have, even aside from the contract provision, of course, is the fact that we are also subject to penalties if we don't satisfy or we don't allow the Amtrak trains running on our tracks to satisfy the metrics and standards. Is that separate from the contract? It is. It is. It is. It's a separate regulatory impact. This is the provision that says if the Amtrak trains don't satisfy the metrics and standards, at Amtrak's request, they can bring an enforcement proceeding against us in the Surface Transportation Board. Now, ultimately, that determination will look at, for example, whether or not we've satisfied the preference requirement, but the point is is that the government, in order to get the penalties, need to prove two things. They need to prove a violation of metrics and standards, and then they need to prove a violation of the preference requirement. So as Justice Alito correctly noted, if we comply with the metrics and standards, we don't get dragged into an enforcement proceeding where we can get sanctioned. If we do comply with the metrics and standards, we can't get dragged into an enforcement proceeding. That's regulatory power. I have nothing further. All right. Thank you. The case will be submitted.
judges: Brown, Williams, Sentelle